**CODMAN v. UNITED STATES.**

No. 7289.

District Court, D. Massachusetts.

Dec. 27, 1939.

Francis G. Goodale, Faneuil Adams, and Hill, Barlow, Goodale & Wiswall, all of Boston, Mass., for plaintiff.

Edmund J. Brandon, U. S. Atty., and C. Keefe Hurley, Asst. U. S. Atty., both of Boston, Mass., for defendant.

FORD, District Judge.

This is a suit to recover capital stock taxes collected from the Codman Trust, hereinafter called the "Trust," for the fiscal years ending June 30, 1933 to June 30, 1937, inclusive. Claims for exemption were made on the following grounds: (a) the Trust was not an association taxable as a corporation; and (b) the Trust was not carrying on or doing business, within the meaning of the applicable revenue acts.

The facts for the most part are stipulated and show that the Trust was formed by an indenture on October 13, 1899. The Trust was created by six of seven owners, representing fourteen-fifteenths of the entire interest in a parcel of real estate situated at 184 Washington Street, Boston, Massachusetts. All of the owners acquired their respective interests by inheritance. For sometime prior to October 13, 1899 and on that date, the building was leased in its entirety to one Wilkinson, who conducted thereon a hardware business. The same lessee continues to occupy the premises. The indenture, which sets forth a contemporaneous conveyance of the property to the trustees named in the instrument, namely, Edmund D. Codman and Charles K. Cobb, recites that the trustees or their successors to be appointed by the court or by consent of all the parties, shall hold the realty for the benefit of the creators with full power at all times to sell all or any part of the property at public or private sale upon such terms as they see fit, or to lease all or any part of it. The trustees were to have the absolute power of owners in selling or leasing the property with power to commit the management of the property to the trustee Codman. Later the trustee Codman assumed the managership of the property. Reasonable compensation was provided for the trustees and neither trustee was to be responsible for the act or default of the other. The income of the property was to be distributed among the creators of the Trust and certificates were to be issued to the beneficiaries in amounts proportionate to their interest in the property. Each shareholder had a right to sell any or all of his shares and new certificates were to be issued to the purchasers who were to become subject to the terms of the trust indenture. The trust property as of the date of the trust agreement was to have a value of $224,000 and 224 certificates were issued to the beneficiaries at a par value of $1,000 each. The Trust was to continue for twenty years if the property was not sooner disposed of, at which time the trust property was to be sold and the proceeds distributed to the beneficiaries proportionately to the interest of each. In the event the trustees thought it best to sell the property and divide the proceeds before the expiration of the twenty years, they had the power to do so. The Trust was to terminate on the sale of the property in either case. The trustees were

given the power also to purchase the remaining undivided fifteenth part of the real estate from the holder, subject to the terms of the Trust with the right to increase the valuation of the Trust to $240,000 and issue additional certificates therefor. The Trust was extended in 1919 and also in 1939 by all the shareholders, the number of which had increased, for an additional twenty years. The trustee, Charles K. Cobb, has since deceased and the said Codman is now the sole trustee.

The receipts and expenditures of the Trust were on a calendar year basis and it was agreed by the parties that those figures might be used as a basis for determining whether or not the capital stock tax was properly levied.

Facts further show that the trust property was leased by the trustees to the lessee Wilkinson by a series of leases with varying rentals, beginning October 4, 1900. The lease executed on this date was for a term of four years at an annual rental of $15,000 and by its terms required the lessee to pay all expenses for taxes, repairs, etc. Leases for different rentals, for terms of three years up to 1931, and thereafter up to the present date for yearly terms, were made following the year 1904. Up to the year 1931 the leases were so-called "net" leases. In 1931, the lease was signed for an annual rental of $24,000 gross, the trustees paying the taxes and insurance, but nothing for repairs. The leases during the tax years here involved provided for annual rentals of $16,500 to $24,000, which were paid to the trustees.

It was stipulated between the parties that the Trust on January 1, 1932 owned securities to the amount of $51,627.75, which had been purchased between the years 1902 and 1927. Most of these were still held by the Trust during the tax periods involved. On December 19, 1932, the trustees purchased $5,000 Terre Haute Traction & Light Company bonds at a cost of $4,300; December 6, 1935, bonds of the Illinois Central Railroad Company at a cost of $4,450; October 6, 1936, $5,000 Boston & Maine Railroad bonds at a cost of $4,462.50. On June 1, 1937, bonds of the Portsmouth Great Falls & Conway Railway Company which cost $2,580 were called and redeemed for $3,000. The total cost of investments on hand December 31, 1937 was $62,260.25. During the years 1932–1937, inclusive, interest and dividends were received on its investments to the amount of $12,270.

In the year 1932, the trustees received a refund of taxes from the City of Boston amounting to $11,656.68 and paid from this amount counsel and expert fees in the sum of $2,387.70, made a refund to the lessee in the sum of $4,218.27 and retained for themselves $5,050.70. Disbursements of profit were regularly made to the beneficiaries as also payments for insurance, taxes, commissions and legal services during the years in question.

The first question presented here is whether or not the plaintiff was an "association" and taxable as a corporation, within the meaning of the revenue acts.

Section 1111 (a) of the Revenue Act of 1932, 26 U.S.C.A. § 1696(3), provides that "the term 'corporation' includes associations, joint-stock companies, and insurance companies." A similar provision is found in other applicable revenue acts.

The characteristics that a trust must possess to constitute it an association, within the meaning of the revenue acts, are set forth in the case of Morrissey et al. v. Commissioner of Internal Revenue, 296 U.S. 344, at pages 356, 357, 56 S.Ct. 289, at page 295, 80 L.Ed. 263. The Court states in that case, that

" 'Association' implies associates. It implies the entering into a joint enterprise, * * * an enterprise for the transaction of business. * * * Thus a trust may be created as a convenient method by which persons become associated for dealings in real estate, * * * where those who become beneficially interested * * * seek to share the advantages of a union of their interests in the common enterprise. * * *

"The inclusion of associations with corporations implies resemblance; but it is resemblance and not identity. The resemblance points to features distinguishing associations from partnerships as well as from ordinary trusts."

And further, 296 U.S. at page 359, 56 S.Ct. at page 296, 80 L.Ed 263: "Corporate organization furnishes the opportunity for a centralized management through representatives of the members of the corporation. The designation of trustees, who are charged with the conduct of an enterprise, who act 'in much the same manner as directors,' may provide a similar scheme, with corre_ponding effectiveness."

The Court went on to point out other characteristics that a trust may have analogous to those of a corporation, such as security from termination by the death of owners of beneficial interests, facilities to transfer beneficial interests without affecting the continuity of the enterprise and to introduce a large number of participants.

From these principles, it seems that the test to be applied is whether the Trust is an organization with advantages analogous to a corporation and carrying on a business enterprise.

■ Applying this test to the present set of facts, it appears that the Trust here constituted an association. The Trust was created for the purpose of managing and selling a valuable parcel of real estate. In fact, the indenture of trust itself recognized that management was necessary in that it permitted one of the trustees to act as such. The indenture provides for the issuance of shares with the right of transfer by sale of any or all of the shares possessed by a beneficiary, thus making possible the introduction of a large group of shareholders. It was secure from termination by the death of shareholders. There was centralized control in the trustees, and continuity of the enterprise was provided by the provision of the sale of shares. It had, it is apparent, the characteristics of a corporation. Further, it was an enterprise conducted for the common profit of all the shareholders and substantial profits flowed to it as outlined above. It was not merely collecting income and conserving the property for the purpose of distribution. It was engaged in something more than this. Looking at its activities, it appears that immediately after it was established and up through the tax years involved here, it purchased a substantial amount of securities out of surplus accumulated from the income of the property and these securities were purchased for profit. It was in continuous existence almost forty years and had been extended for twenty more in 1939. There arose necessity for leasing of the property every three years from 1904, which was the expiration date of the original lease, up to 1931 and yearly from that date on. And the leases called for yearly substantial rentals and changing terms. This required management and negotiations and was activity for the purpose of creating profit.

The terms of the trust agreement and the activities of the trustees under it, force the conclusion that it was a business enterprise. It was organized for the purpose of owning, managing, leasing, and selling real estate and distributing the gains therefrom to shareholders, and its activities reflected that it was doing just what it was organized to do. Morrissey et al. v. Commissioner of Internal Revenue, supra; Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 56 S.Ct. 285, 80 L.Ed 278; Title Ins. & Trust Co., v. Commissioner of Internal Revenue, 9 Cir., 100 F.2d 482; Solomon et al. v. Commissioner of Internal Revenue, 5 Cir., 89 F.2d 569, 571; Little Four Oil & Gas Co. v. Lewellyn, 3 Cir., 35 F.2d 149; United States v. Trust No. B. I. 35, 9 Cir., 107 F.2d 22, October 25, 1939.

The fact that only one piece of property was included in the Trust and that no control was vested in the shareholders is of no importance. Helvering v. Combs et al., 296 U.S. 365, 56 S.Ct. 287, 80 L.Ed. 275; Swanson et al. v. Commissioner of Internal Revenue, 296 U.S. 362, 56 S.Ct. 283, 80 L.Ed. 273.

The remaining question to be decided is whether the taxpayer was doing business during the tax years involved, within the meaning of the applicable revenue acts. The National Industrial Recovery Act, Chapter 90, 48 Stat. 195, 207, Section 215, reads as follows:

"(a) For each year ending June 30 there is hereby imposed upon every domestic corporation with respect to carrying on or doing business for any part of such year an excise tax of $1 for each $1000 of the adjusted declared value of its capital stock. * * *

"(c) The taxes imposed by this section shall not apply—* * *

"(3) to any domestic corporation in respect of the year ending June 30, 1933, if it did not carry on or do business during a part of the period from the date of the enactment of this Act to June 30, 1933, both dates inclusive; * * *."

A detailed summary of the law governing the situation presented here would be merely space-eating, and much of the discussion above is applicable here. I have outlined the principles governing this type of case at some length in the case of American Investment Securities Company v. United States, D.C., 27 F.Supp. 494. The more important cases showing the trend of the law in similar premises are: Edwards v. Chile Copper Co., 270 U.S. 452, 46 S.Ct.

345, 70 L.Ed. 678; Von Baumbach v. Sargent Land Co., 242 U.S. 503, 37 S.Ct. 201, 61 L.Ed. 460; United States v. Peabody Co., 6 Cir., 104 F.2d 267; Page et al. Ex'rs v. M. Rich & Bros. Co., 5 Cir., 99 F.2d 607; United States v. Atlantic Coast Line Co., 4 Cir., 99 F.2d 6; Harmar Coal Co. v. Heiner, 3 Cir., 34 F.2d 725, certiorari denied, 280 U.S. 610, 50 S.Ct. 159, 74 L.Ed. 653.

Tested by the principles announced in these cases, if a corporation, or here an association, is organized for profit and was doing what it was organized to do in order to realize profit, it makes little difference how few or how small its activities are in carrying out its purpose. It is held to be doing business.

I conclude that the plaintiff was doing business, within the meaning of the revenue acts. As was said above, the Trust was established for the purpose of securing a profit from the realty for the beneficiaries named; management of the enterprise was a necessity; control of the property was in the Trust; the placing of advantageous leases triennially and later annually with varying terms and activities was considerable of an activity; surplus had been established and securities of substantial value were purchased. The organization has continued for about forty years with no indication of liquidation. These operations place it within the statutes cited.

The requests of the defendant for findings of fact and conclusions of law are all substantially granted.

Judgment for the defendant, with costs.